68 F.3d 462
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jahid Arif WILLIAMS, Defendant-Appellant.
 No. 94-5556.
 United States Court of Appeals, Fourth Circuit.
 Argued July 10, 1995.
Decided Oct. 11, 1995.
 
 ARGUED: Barbara Rubin Hudson, Danville, Virginia, for Appellant. Karen Breeding Peters, Assistant United States Attorney, Roanoke, Virginia, for Appellee. ON BRIEF: Robert P. Crouch, Jr., United States Attorney, Roanoke, Virginia, for Appellee.
 Before NIEMEYER, HAMILTON, and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Jahid Arif Williams and his wife, Dionne Williams, were indicted for possession of crack cocaine with the intent to distribute based on evidence obtained from them at the Danville, Virginia train station on January 27, 1994. Jahid Williams filed a motion to suppress the evidence, which was denied after a suppression hearing. On May 13, 1994, a jury found Jahid Williams and his wife, Dionne, guilty. Jahid Williams was sentenced to 20 years imprisonment, the minimum based on his criminal history and his possession of 478 grams of crack cocaine, and his wife was sentenced to time served, as a result of the government's motion for a departure based on her substantial assistance. Jahid Williams filed this appeal.
 
 
 2
 On appeal, Williams contends that (1) he was illegally stopped at the Danville train station, (2) he was illegally searched, (3) the evidence was insufficient to support his conviction, and (4) the disparate sentences of Williams and his wife denied him due process and equal protection. Because we find Williams' arguments without merit, we affirm.
 
 
 3
 * On January 26, 1994, at about 4:30 p.m., Detective Charles Evans of the Danville, Virginia Police Department received a phone call from Special Agent Kowalski of the Drug Enforcement Administration in Greensboro, North Carolina. Kowalski told Evans that two persons with the last name Williams would be traveling together on an Amtrak train from New York to Danville, Virginia, that the train was scheduled to arrive at 11:33 p.m. but would be running late, and that the Williamses would be carrying a quantity of crack cocaine. After Detective Evans directed the dispatcher to call Amtrak to verify that two persons named Williams were in fact on the train, he, together with Detectives Bostic and Waldron went to the Danville train station.
 
 
 4
 The train arrived at approximately 2:10 a.m., and four adults and one child exited the train. One adult appeared to be walking by himself in front of the others, and he left the train station without being approached by the officers. After the remaining three adults and one child entered the station waiting room, Detective Bostic asked if he could speak with them for a moment, showing them his badge and identifying himself as a police officer. Jahid Williams placed his blue suitcase down on the floor next to him while his wife Dionne placed a black duffel bag on the floor next to her. The third adult, who made an effort to distance himself from the Williamses, was Kevin Whittaker, the Williamses' uncle. Detective Bostic explained that the police were conducting a drug interdiction investigation and were attempting to locate weapons, contraband, or illegal drugs. He then asked to see their train tickets. Jahid Williams gave Detective Bostic a ticket with a travel route of Penn Station, New York to Danville and the name Williams printed on it. Bostic then asked the Williamses if they had any narcotics or weapons in their possession, to which the Williamses responded by shaking their heads in a negative manner. Bostic then said, "You would not have any objections if we looked through your luggage then, would you?" According to Bostic, both Williamses then shook their heads indicating no, they would not have any objections, and Dionne Williams responded, "Go ahead."
 
 
 5
 Detectives Waldron and Evans had similar recollections. Waldron, who was standing near Bostic, stated that both Jahid and Dionne Williams shook their heads as if they did not mind their luggage being searched, and Dionne Williams responded, "Go ahead." Evans stated that all three adults manifested an agreement to the search of their luggage and Kevin Whittaker explicitly consented to a search. According to Dionne Williams' testimony at the hearing on the motion to suppress, when asked by police if she would mind if they searched the luggage, she responded that they could go ahead and search. Also testifying at the suppression hearing, Jahid Williams denied that he shook his head in a negative manner in response to the question whether he would have any objection to the search of his luggage, and thus indicated that he did not manifest consent to the search. At trial, however, he testified that he did shake his head in a negative manner in response to this question and thus manifested his consent to the search.
 
 
 6
 After obtaining consent from the defendants, Detective Bostic opened the suitcase that Jahid Williams had been carrying and searched its contents, while Detective Waldron opened the duffel bag that Dionne Williams had been carrying and searched its contents. Inside the duffel bag, Waldron found a pound of crack cocaine (478.6 grams) wrapped first in scented anti-static cling dryer sheets and then in burgundy colored bed sheets. In addition to the two large bags of crack cocaine, there was a smaller bag of cocaine powder. Inside the suitcase, Bostic found a roll of the dryer sheets. Upon discovering the drugs in Dionne's duffel bag, Waldron exclaimed, "Bingo," after which Dionne Williams let out a loud sigh.
 
 
 7
 The parties were arrested and transported to the police station, where Jahid Williams asked Detective Bostic what would happen to his wife and child. Bostic responded that Jahid and his wife would be charged and that social services would be contacted about the child. Upon hearing this, Jahid stated, "She didn't know anything about it. I was carrying it." Bostic replied that the drugs were discovered in the bag carried by his wife, to which Jahid responded, "She may have been carrying the bag, but she did not know about the drugs."
 
 
 8
 At trial both Jahid and Dionne Williams denied any knowledge of the cocaine and suggested that their uncle, Kevin Whittaker, may have placed it in their luggage. The jury returned guilty verdicts against both Dionne and Jahid Williams, and Jahid filed this appeal.
 
 II
 
 9
 Williams contends that the information provided to Detective Evans by Special Agent Kowalski--that the Williamses would be arriving in Danville on a particular train with crack cocaine--was insufficient to constitute a reasonable articulable suspicion to justify Evans' stop of the Williamses at the train station. We disagree.
 
 
 10
 Detective Evans reasonably considered Special Agent Kowalski to be a reliable source since Kowalski was a federal law enforcement agent from a neighboring city who was responsible for the investigation and interdiction of drugs. Moreover, Kowalski provided detailed information about the suspects' travel circumstances, which was corroborated. The Williamses appeared as passengers on the train, as forecast, and when they arrived, their tickets showed their name and the correct departure city.
 
 
 11
 If an officer has a reasonable, articulable suspicion that a person has just committed or is about to commit a crime, the officer may temporarily seize the person for purposes of questioning limited to the purpose of the stop. See Florida v. Royer, 460 U.S. 491 (1983). In this case, Detective Evans had justification to stop the Williamses. But there is no evidence to indicate that the Williamses were stopped and precluded from continuing on their way. When Detective Bostic asked the Williamses if he could speak with them for a moment, they placed their suitcases down on the floor, showing apparent agreement. Moreover, they freely answered questions put to them. Thus, the Fourth Amendment was not yet implicated so as to require the reasonable suspicion necessary for a stop. Nevertheless, the officers had a reasonable suspicion to make a stop.
 
 III
 
 12
 Williams next contends that his motion to suppress the evidence obtained by the officers' search of his and his wife's luggage should have been granted. He contends that on the facts available to the district court at the motion hearing, it was clear error for the court to have concluded that Williams or his wife voluntarily consented to a search of their bags. We disagree.
 
 
 13
 The evidence was ample to support the district court's factual conclusion that the defendants consented to the search. Both Dionne Williams and Whittaker verbally consented and both Dionne and Jahid Williams consented with a nod of their heads. Moreover, as the search continued, no one protested that it was not authorized. Finally, both Dionne and Jahid Williams eventually testified that they consented to the search.
 
 
 14
 In reviewing the district court's denial of a motion to suppress evidence, we review the court's factual findings for clear error, and apply the ultimate suppression decision de novo. See United States v. Gordon, 895 F.2d 932, 937 (4th Cir.1990). In this case we conclude that the district court did not clearly err in finding that the Williamses consented to the search.
 
 IV
 
 15
 Williams contends that a rational jury could not have concluded beyond a reasonable doubt that he was guilty of possession with intent to distribute cocaine. He contends that a rational jury would have found that Kevin Whittaker was responsible for putting the drugs in Williams' bags since Whittaker was in possession of their bags for periods of time during the train ride and since Whittaker, upon being questioned by the police, falsely denied his association with the Williamses. As the government points out, however, the evidence showed that the Williamses admitted to having packed the suitcases together. When the drugs were discovered, Dionne Williams let out a long sigh. And at the police station Jahid Williams stated that his wife knew nothing about the drugs and that only he was responsible. Given these facts, the jury was entitled to conclude that the Williamses were guilty of the offenses charged.
 
 V
 
 16
 Finally, Williams contends that the disparity between his wife's sentence and his own "highlights the arbitrary and capricious application of the 'mandatory' sentencing guidelines, and highlights the anomalous results of a system whereby the government, at its whim, can obtain outrageously divergent sentencing upon convictions for the same criminal act." Jahid Williams was sentenced to 20 years and his wife to time served. Williams contends that the government's actions in filing a motion to reduce his wife's sentence leads to a disparity in defendant sentences that "shocks the conscience."
 
 
 17
 We have held that in order to constitute a due process violation, the government's conduct "must be so outrageous as to shock the conscience of the court." United States v. Osborne, 935 F.2d 32, 36 (4th Cir.1991) (analyzing an entrapment claim). In the case before us, the government's action in filing a substantial assistance motion on Dionne Williams' behalf certainly did not shock the conscience. And, just because Jahid's sentence of 20 years was statutorily mandated, based on his prior felony drug conviction, does not make his sentence unconstitutional. See United States v. Whitehead, 849 F.2d 849 (4th Cir.1988) (provision of mandatory terms for drug offenses does not violate due process or equal protection clause or Eighth Amendment); United States v. Campbell, 980 F.2d 245 (4th Cir.1992) (upholding sentencing enhancement based on prior felony drug conviction). Even though it may appear unusual that Dionne Williams was released on time served, neither the government nor Dionne Williams appealed her sentence, and accordingly we do not have any basis for reexamining her sentence. Jahid Williams' mandatory minimum sentence is legal and constitutional, and thus we reject his arguments.
 
 
 18
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 AFFIRMED